UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH JILSON,

Plaintiff,

v.

JEREMY ELROD, et al.,

Defendants.

_____/

Case No. 21-cv-11878

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS (ECF No. 8)

### I.   INTRODUCTION

On August 13, 2021, Plaintiff Kenneth Jilson initiated this action against Jeremy Elrod, SWORD International, Inc. ("SWORD"), SWORD Manufacturing, and Assured Outcomes Group, Inc. ("AOG").  ECF No. 1.  Jilson brings claims for default in contract (Count I), unjust enrichment (Count II), promissory estoppel (Count III), fraudulent inducement (Count IV), breach of fiduciary duty (Count V), minority oppression (Count VI), and, in the alternative to Counts V and VI, securities fraud pursuant to MCL § 451.2101, *et seq.* (Count VII).  *Id.*  He also requests declaratory judgment (Count VIII).  *Id.*

1

Presently before the Court is Defendants' Motion to Dismiss Under Rule 12(b)(2).  ECF No. 8.  Plaintiff filed a timely response, ECF No. 9, and Defendants replied, ECF No. 10.  Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of this matter.  Therefore, the Court will resolve the instant Motion on the briefs.  *See* E.D. Mich. LR § 7.1(f)(2).  For the following reasons the Court will **DENY** Defendants' Motion to Dismiss (ECF No. 8).

## II.  FACTUAL & PROCEDURAL BACKGROUND

### A. Factual Background

Defendant Elrod is a Nevada resident.  Compl., ECF No. 1, PageID.2.  He has three companies, all registered and with their principal places of business in Nevada.  *Id*.  Defendant SWORD International, is a manufacturer and developer of products used by the United States military, law enforcement, and hunters.  *Id*.  Defendant SWORD Manufacturing is the manufacturing arm of SWORD.  Defendant AOG is an asset recovery company formed to support SpaceX.  *Id*.

Jilson and Elrod met in or about 2014 and developed a friendship while Jilson was living in California.  Elrod Decl., ECF No. 8-2, PageID.137; Compl., ECF No. 1, PageID.3.  As part of their friendship, Jilson routinely provided business advice to Elrod.  *Id*. Jilson also provided Elrod with a "seed working capital loan" in 2015,

2

after SWORD received a military contract.  *Id.* at PageID.4.  Elrod repaid this loan in full, with interest, in 2016, *id.*, and it is not the subject of this lawsuit.

During the Fall of 2017, Jilson and Elrod discussed Jilson becoming more involved in SWORD and Elrod's other businesses.  *Id*.  Thus, on September 13, 2017, Elrod and Jilson executed a promissory note (the "First Note") on a $58,000 loan Jilson provided Elrod, as the obligor, for a two-year term at a 15% interest rate (the "First Loan).  *Id.* (citing First Note, ECF No. 1-2).  Jilson provided the funds on September 26, 2017.  *Id*.  Although Elrod signed as the obligor, the funds from the First Loan were to be used by SWORD.  Jilson Decl., ECF No. 9-2, PageID.180.

Despite providing the First Loan, Jilson was concerned about SWORD's viability.  Compl., ECF No. 1, PageID.4.  To allay his concerns, Elrod offered to bring Jilson onboard to help grow and develop SWORD and Elrod's other companies.  *Id*.  Jilson agreed and left his then employer in January 2018.  *Id*.  In consideration for the unpaid work Jilson would be doing, Elrod promised Jilson equity in SWORD.  *Id.* at PageID.5 ("Per our previous conversations I wanted to send you this email to confirm my intent to issue you equity shares in SWORD International.  I believe that you could be a critical part of our team and while I know we have a number of items to tie down I listed below some of the objectives and support I would like to request for 2018.") (quoting Equity Conf., ECF No. 1-3).

3

Jilson began performing in accordance with their agreement, and Elrod promised he would prepare the necessary paperwork to document Jilson's equity in SWORD.  *Id*.

Given his promised ownership interest in SWORD, Jilson provided Elrod, as obligor, a second bridge loan of $30,000, with a one-year term at a 10% interest rate, on April 23, 2018 (the "Second Loan").  *Id*. at PageID.5-6.  Around this time, Jilson also pushed Elrod to provide the documents memorializing Jilson's equity interest in SWORD.  *Id*. at PageID.6 ("This email is to confirm my intention to bring you on as an equity partner at SWORD International. . . .  I am open to the 30% stake we discussed and want only to flesh out details to ensure we are tracking on everything.") (quoting Second Equity Conf., ECF No. 1-4).  As with the First Loan, despite Elrod signing as the obligor, the funds for the Second Loan were also to be used by SWORD and SWORD Manufacturing.   Jilson Decl., ECF No. 9-2, PageID.180.

Throughout the following months, Jilson worked with Elrod on all of SWORD, SWORD Manufacturing, and AOG's day-to-day business operations.  Compl., ECF No. 1, PageID.6.  This included "overseeing the company finances, setting product prices, managing the inventory, improving general operating strategies, creating project budgets, reviewing contracts, [and] initiating strategic partnerships among other tasks."  Jilson Decl., ECF No. 9-2, PageID.180-81.  In

4

addition to the operational work he was doing for the SWORD entities, Plaintiff's work for AOG included setting up employee payroll, managing 1099's, and invoicing SpaceX for all costs.[1]  *Id.* at PageID.181.

Notably, in July 2018, Plaintiff moved from California to Michigan.  *Id.* at PageID.179.  Nevertheless, he still communicated daily with Elrod and other employees of SWORD, SWORD Manufacturing, and AOG to conduct the business of the entities.  *Id.* at PageID.181.  In doing so, Jilson "received thousands of emails, phone calls, and text messages to [his] Michigan based devices."  *Id.*

In September 2018, Jilson and Elrod agreed Jilson would be compensated $5,000 per month for his work with AOG.  Compl., ECF No. 1, PageID.7; Jilson Decl., ECF No. 9-2, PageID.181.  Jilson sent invoices for September, October, and November of 2018, but Elrod only paid the fee for September.  *Id.* at PageID.182.  At that time, Elrod was using AOG's profits to support SWORD, comingling funds between the two entities.  Compl., ECF No. 1, PageID.7. Given the financial situation, Elrod and Jilson agreed to stop paying themselves from AOG's profits and

---

[1] Defendants aver Jilson "did not perform any work AOG, either directly or indirectly, other than to provide guidance as an unpaid mentor."  2d Elrod Decl., ECF No. 10-3, PageID.364.  However, as stated in Section III.A *infra*, "the court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal."  *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

5

instead use all the capital to support SWORD. *Id.* Nevertheless, Jilson did not waive the $10,000 that remained outstanding from his AOG invoices. *See* Jilson Decl., ECF No. 9-2, PageID.182.

On November 25, 2018, Jilson provided a third bridge loan of $75,000, with a two-year term at a 10% interest rate, to SWORD as obligor (the "Third Loan"). Compl., ECF No. 1, PageID.7. Jilson and Elrod verbally agreed to the terms of the loan. *Id.* Jilson prepared a promissory note memorializing the terms of the agreement, which he then sent to Elrod, but Elrod never returned the executed note. *Id.*; *see also* Unexecuted Third Note, ECF No. 1-6. Nonetheless, Jilson initiated the wire transfer of the funds from Michigan. Jilson Decl., ECF No. 9-2, PageID.182; *see also* Compl., ECF No. 1, PageID.7 ("When you get a moment can you prepare an outbound wire from my saving account for $75,000?") (quoting Wire Transfer Req., ECF No. 1-5, PageID.47).

Jilson asked about the status of repayment for the First Loan on January 15, 2019. *Id.* at PageID.8. The First Loan was supposed to enter repayment in September 2018 and was fully due in September 2020. First Note, ECF No. 1-2, PageID.39. While Elrod acknowledged that he still needed to repay the First Loan, he took little to no action for several months. Compl., ECF No. 1, PageID.8. Then, in June 2019, Elrod assured Jilson that SWORD would soon be in position to repay

6

the outstanding loans.  *Id.* (requesting a $250,000 loan to complete several projects "total[ing] almost a million dollars in sales" in return for finishing the paperwork documenting Jilson's equity in SWORD, giving Jilson "complete financial controls and approval," beginning to pay back Jilson's personal loans "ASAP," continuing to reroute AOG funds as available, and prioritizing repaying the note "over anything else") (quoting June 19, 2019 Email, ECF No. 1-7, PageID.53).

Thus, on June 27, 2019, Jilson agreed to provide another bridge loan of $50,000, with a one-month term at a 1.5% interest rate, to SWORD as obligor (the "Fourth Loan").  *Id.* at PageID.9 (quoting Fourth Loan Conf., ECF No. 1-8, PageID.55).  In his email discussing terms of the loan, Jilson also requested Elrod agree to complete the equity paperwork by August 1, 2019.  *Id.*  Elrod acknowledged the terms listed in the email were as they had discussed and "acceptable;" he thus asked that his email response serve as his agreement.  *Id.*  The next day, Elrod emailed Jilson saying that he had attached the signed promissory note, but the email did not contain any attachments.  *Id.* (quoting June 28, 2019 Email, ECF No. 1-9, PageID.57) (citing Unexecuted Fourth Note, ECF No. 1-10).  Again, Jilson nonetheless initiated the wire transfer of the loan from Michigan.  Jilson Decl., ECF No. 9-2, PageID.183.

7

In late August 2019, Jilson followed up with Elrod regarding repayment of the Fourth Loan, which was due earlier that month, as well as other expenses he had fronted for SWORD and AOG.  Compl., ECF No. 1, PageID.11 ("We still have 2 additional expenses reports that are _way_ overdue.  I sent these to you in February and they still have not been resolved.  These need to get processed this week, this is a lot of business expenses for me to be personally carrying. . . .  When are you going to be able to send me a payment for the $50K note?") (quoting Aug. 25, 2019 Email, ECF No. 1-11, PageID.63) (emphasis in original).

Jilson followed up again in May 2020 and asked for a plan to resolve the outstanding debt.  _Id._ at PageID.11-12 ("What is the plan to get these loans paid? the 30K note is now 1 year overdue and is technically in default.  With the other notes, the company owe's [_sic_] me $257,611 plus what I am owed in expenses.  I have asked you several times for a payment plan.  You have told me that you would send me a plan[,] but it has never happened. . . .") (quoting May 6, 2020 Emails, ECF No. 1-12, PageID.65).  Elrod replied later that day that he would "wire $50K before the end of the week" and "attempt to clean up the remainder before the end of the year."  _Id._ at PageID.12.   On May 12, 2020, Jilson received a $50,000 wire from AOG.  _Id._  (citing AOG Wire Transf., ECF No. 1-13, PageID.67).  The amount

8

resolved $13,951.72 in business expenses, and the remainder was put towards the balance of the Second Loan.

Around this time, Jilson introduced Elrod to Linear AMS, a Michigan company. Jilson Decl., ECF No. 9-2, PageID.183. SWORD, SWORD Manufacturing, and AOG have worked with Linear AMS to obtain prototypes of products.[2] *Id.* at PageID.184. Also around this time, Jilson began doing product development work for SWORD. *Id.* He billed this work through Inside Track, LLC, a company he owns with his wife, and the invoices listed Jilson's Michigan address. *Id.*

On August 26, 2020, Jilson followed up again about a payment plan for the outstanding loans and expenses. Compl., ECF No. 1, PageID.12-13 (quoting Aug. 26, 2020 Texts, ECF No. 1-14, PageID.69). Elrod responded but did not take any action until December 2020 when he asked for documentation for the outgoing and incoming payments. *Id.* at PageID.13 (quoting ECF No. 1-15, PageID.71).

---

[2] Defendants dispute this allegation and argue that "[a]lthough the parties communicated about a not-for profit project, AOG never paid or received good or services from Linear AMS." 2d Elrod Decl., ECF No. 10-3, PageID.364. However, as stated in Section III.A *infra*, "the court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal." *Theunissen*, 935 F.2d at 1459.

9

Jilson followed up yet again in January 2021, and Elrod again assured Jilson that he would soon be able to pay him back. *Id*. However, Elrod did not pay him, so Jilson reached out again on February 1 and 13, 2021. *Id.* at PageID.13; *id.* at PageID.14 ("I haven't heard from you since our txt [*sic*] exchange last week. I've asked multiple times for a plan[;] however[,] you haven' followed up with me. I'm more than a little concerned at this point.") (quoting Feb. 13, 2021 Email, ECF No. 1-16, PageID.73). Elrod eventually responded that he was writing at Jilson's request "to reconfirm what [they had] discussed on the phone and via text previously" and that he "underst[oo]d that the note [was] past due based on the original paperwork," but Jilson "had given permission to extend based off of company needs." *Id.* (quoting Feb. 18, 2021 Email, ECF No. 1-17, PageID.75). Nevertheless, Elrod was "committed to repay the note and to do[ing] so at the earliest opportunity" but he "simply d[id] not have the liquidity" to do so "this quickly." *Id.* (quoting Feb. 18, 2021 Email, ECF No. 1-17, PageID.75). Thus, Elrod "guarantee[d] . . . to repay the note upon delivery and payment of [their] Airforce tandem barrel contract" in mid-April. *Id.* (quoting Feb. 18, 2021 Email, ECF No. 1-17, PageID.75).

When Jilson proposed a payment plan that included a payment each at the end of February and March with the remaining balance due at the end of April, *id.* at PageID.15 (quoting Feb. 21, 2021 Email, ECF No. 1-18, PageID.77), Elrod

10

responded that he could not commit to that schedule, but he would "do everything possible to start making payments and hopefully secure a line of credit as previously discussed," *id.* (quoting Feb. 26, 2021 Email, ECF No. 1-19, PageID.79).

In March 2021, Jilson asked Elrod to propose a payment plan by April 1 because Elrod had rejected his without proposing an alternative. *Id.* (quoting ECF No. 1-20, PageID.81). Jilson also warned that Elrod's uncertainty about the financial health of the business "ha[d him] more than a little concerned" and Jilson would proceed to legal action if Elrod was unable to service the debt. *Id.* (quoting ECF No. 1-20, PageID.81). In response to this email, Elrod called Jilson to tell him the bank would extend a $250,000 line of business credit for SWORD and Elrod was expecting significant customer invoice payments that would allow him to resolve the debt. *Id.* at PageID.15-16. He also reiterated this via text message. *Id.* at PageID.16 (citing Apr. 5, 2021 Text, ECF No. 1-22, PageID.85). Nevertheless, Elrod did not repay Jilson after receiving the line of credit or when the Airforce contract entered repayment. *Id.* at PageID.17 (quoting, Apr. 26, 2021 Text, ECF No. 1-23, PageID.87).

Throughout the month of May 2021, Elrod sent Jilson several reassurances via text message that he was working on the payments. *Id.* at PageID.17-18 (quoting May 5, 2021 Texts, ECF No. 1-24, PageID.89; May 11, 2021 Texts, ECF No. 1-25,

11

PageID.91; May 24, 2021, ECF No. 1-26, PageID.93).  Then, on May 28, 2021,

Elrod sent Jilson a text message saying he had sent an email, presumably confirming

the full payment had been sent, but Jilson did not receive the email or any of the

checks or deposits Elrod had told him to expect.  *Id.* at PageID.18 (quoting May 28,

2021 Text, ECF No. 1-27, PageID.95).

### B. Procedural Background

On August 13, 2021, Jilson initiated the instant action.  *See* ECF No. 1.  As

stated in Section I *supra*, he brings claims for default in contract (Count I), unjust

enrichment (Count II), promissory estoppel (Count III), fraudulent inducement

(Count IV), breach of fiduciary duty (Count V), minority oppression (Count VI),

and, in the alternative to Counts V and VI, securities fraud pursuant to MCL §

451.2101, *et seq.* (Count VII).  *Id.*  He also requests declaratory judgment (Count

VIII).  *Id.*

Defendants move to dismiss pursuant to Federal Rule of Procedure 12(b)(2)

for lack of personal jurisdiction.  ECF No. 8.  They argue that they are Nevada

residents, and Plaintiff was a California resident when he began dealing with them

in 2016.  *Id.* at PageID.118.  Thus, they assert they have insufficient connection to

Michigan to justify the exercise of limited personal jurisdiction over them.  *Id.*

Specifically, Defendants declare sales in Michigan account for less than 1% of the

12

profit from SWORD's sales between SWORD's inception and the time of filing.  *Id.*
at PageID.119; Elrod Decl., ECF No. 8-2, PageID.136.   Likewise, SWORD
Manufacturing had not had any sales in, and AOG has not provided any services in,
Michigan since they were started.  Elrod Decl., ECF No. 8-2, PageID.136; Def. Mot.
to Dismiss, ECF No. 8, PageID.120.   Furthermore, Defendants aver Elrod did not
know when Jilson moved to Michigan; regardless, "their only business relationship
has been about contracted project management work on an Air Force project in
Nevada, managing work being performed in California."   *Id.* at PageID.121.
Moreover, Defendant Elrod has not been to Michigan in his adult life.  *Id.*
Accordingly, Defendants contend Plaintiff's "claims arise directly from Defendants'
activity in Nevada, and Mr. Jilson's financial and employment relationships with
those companies, even if the consequences occurred wherever Plaintiff was living at
the time" and it is therefore "unreasonable for this Court to exercise personal
jurisdiction over parties with no connection to or presence in Michigan, over a case
for which Michigan has no interest as the forum state (the loans being governed by
California law, made to borrowers in Nevada)."  *Id.* at PageID.124-25.

Plaintiff counters,

Defendants have conducted activities in Michigan directly involving
the claims alleged in this case, including borrowing money from
Plaintiff Kenneth Jilson [] in Michigan, accepting the performance of
services for Defendants by Plaintiff in Michigan, engaging in countless

13

> communications with Plaintiff for these purposes, [and] commit[ing]
> torts whose consequences were felt in Michigan.

ECF No. 9, PageID.149.  Thus, Plaintiff argues Defendants have had contacts with

Michigan sufficient to satisfy the State's long-arm statute and the Constitution's Due

Process Clause.  *Id.* at PageID.163-64, PageID.167.

Additionally, Plaintiff asserts Elrod was aware Jilson had moved to Michigan

and made plans to visit him.  *Id.* at PageID.153 (citing Jilson Decl., ECF No. 9-2,

PageID.181; Oct. 21, 2020 Email Re: Mich. Travel, ECF No. 9-6, PageID.196).

Plaintiff emphasizes that "Defendants have failed to contradict Plaintiff's allegations

by affidavit or otherwise."  *Id.* at PageID.160.  Specifically, Plaintiff contends

Elrod's affidavit "does not address the payments Defendants sent to and from

Michigan, the communications Defendants sent to and from Michigan, that Jilson

operated Defendant businesses from Michigan, or any of the other jurisdictional

facts and evidence Jilson alleged in his Complaint or herein."  *Id*.

In Reply, Defendants aver the First and Second Loan as well as the initial

promises and alleged fraudulent misrepresentations that form the basis of Plaintiff's

claims all occurred before Jilson moved to Michigan.  ECF No. 10, PageID.334-35.

Thus, Defendants reassert the connection between them and the State of Michigan

is "purely coincidental."  *Id.* at PageID.336.  Moreover, they maintain, jurisdiction

cannot be based on Plaintiff's "random, unilateral move to Michigan."  *Id.* at

14

PageID.337.  This is because, they contend, "a 'plaintiff cannot be the only link between the defendant and the forum.'"  *Id.* at 338 (quoting *LePine v. Rosenbaum*, No. 19-CV-12577, 2020 WL 2836275, at *10 (E.D. Mich. June 1, 2020)). Defendants describe Plaintiff as "noting more than a remote contractor for SWORD who happened to move in Michigan."  *Id.*  Finally, Defendants argue AOG never paid for or received goods or services from Linear AMS and Plaintiff's work for Inside Track is irrelevant because that entity is not a party.  *Id.* at PaheID.340.

## III.   LAW & ANALYSIS

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(2) governs motions to dismiss for lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2).  Plaintiff has the burden of establishing personal jurisdiction.  He "'must show the specific facts demonstrating that the court has jurisdiction' and must make a prima facie showing of personal jurisdiction."  *Carter v. Univ. of Tex. at Dallas*, No. 20-1714, 2021 WL 243811, at *2 (6th Cir. Jan. 20, 2021) (quoting *Miller v. AXA Winterthur Ins.*, 694 F.3d 675, 678 (6th Cir. 2012)).

Where, as here, the court "rules on a jurisdictional motion to dismiss under Rule 12(b)(2) without an evidentiary hearing, it must consider the pleadings and affidavits in the light most favorable to the plaintiff."  *Id.*  Additionally, "the court

15

disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

This Court can exercise personal jurisdiction over Defendants if Michigan's long-arm statute "reaches the controversy and the exercise of personal jurisdiction comports with constitutional due process." *Carter*, 2021 WL 243811, at *2. "In Michigan, these analyses often merge, because Michigan's long-arm statute, 'extend[s] to the outermost boundaries permitted by the due process clause.'" *Id.* (quoting *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1216 (6th Cir. 1989)); *see also Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005); *Zellerino v. Roosen*, 118 F. Supp. 3d 946, 950 (E.D. Mich. 2015) ("Under Michigan's long-arm statute, the state's jurisdiction extends to the limits imposed by federal constitutional Due Process requirements, and thus, the two questions become one.") (citations omitted).  As such, Defendants' Motion turns on whether this Court's exercise of personal jurisdiction comports with their federal due process rights.  *Lifestyle Lift Holdings, Inc. v. Prendiville*, 768 F. Supp. 2d 929 (E.D. Mich. 2011) (citing *Chandler v. Barclays Bank PLC*, 898 F.2d 1148, 1150 (6th Cir. 1990))

To comport with federal due process, Plaintiff must satisfy a three-part test:

First, the defendant[s] must purposefully avail [themselves] of the privilege of acting in the forum state or causing a consequence in the

16

forum state.  Second, the cause of action must arise from the defendant[s'] activities there.  Finally, the acts of the defendant[s] or consequences caused by the defendant[s] must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant[s] reasonable.

*Carter*, 2021 WL 243811, at *3 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).  "[O]ut-of-state defendants" must "have 'minimum contacts' with the forum state sufficient to comport with 'traditional notions of fair play and substantial justice.'"  *Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945))

### B. Discussion

#### 1. Defendants have purposefully availed themselves of acting or causing a consequence in Michigan.

The "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal citations and quotation marks omitted).  Nonetheless, "even a single act can support jurisdiction" if the connection created to forum was sufficiently substantial.  *Id.* at 476, n. 18.  Indeed, the Supreme

17

Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 476.

As a threshold matter, the Court notes Defendants arguments regarding how little business SWORD conducts in Michigan are unavailing. "The proper test for personal jurisdiction is not based on a 'percentage of business' analysis as contended by [defendant], but rather on whether the absolute amount of business conducted by [defendant] in Michigan represents something more than 'random, fortuitous, or attenuated contacts' with the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891–92 (6th Cir. 2002) (quoting *Burger King,* 471 U.S. at 475) (internal quotation marks omitted).

Indeed, the Sixth Circuit Court of Appeals found purposeful availment in a case analogous to this one. In *Power Invs., LLC v. SL EC, LLC*, the defendants, a Missouri corporation and citizen, secured $300,000 in loans from the plaintiff, a Nevada corporation whose sole member lives in Kentucky. 927 F.3d 914, 916 (6th Cir. 2019). The defendants "called, texted, and emailed [the plaintiff] many times, seeking funds and making many allegedly false assurances." *Id.* The plaintiff sued for misrepresentation and unjust enrichment. *Id.* at 917. Using *Calder v. Jones*, 465 U.S. 783 (1984) and *Walden v. Fiore*, 571 U.S. 277 (2014) as guide posts, the Sixth Circuit determined *Power Investments* was much closer to *Calder*, where the

18

Supreme Court had found the exercise of personal jurisdiction was proper.  *Id.* at

918.

Specifically, the Sixth Circuit recognized that a defendants' "intentional

fraudulent communications" can establish limited personal jurisdiction when such

communications are not "'merely incidental' but at the core of the lawsuit."  *Id.* at

919 (quoting *Neal v. Janssen*, 270 F.3d 328, 330 (6th Cir. 2001).  Thus, the *Power*

*Investments* Court found the defendants had initiated the relationship with the

plaintiff, "communicated with him extensively for well over a year, wheedling

several advances, gathering third-party financing, and eventually obtaining a

bailout."  *Id.* at 919.  The Sixth Circuit concluded the "alleged misrepresentations in

these communications constitute[d] the core of [the plaintiff's] fraud claims."  *Id.*

Similarly, in a case involving an interstate contract, the Sixth Circuit held that

"where a defendant 'has created continuing obligations between himself and the

residents of the forum, he manifestly has availed himself of the privilege of

conducting business there.'"  *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503

F.3d 544, 551 (6th Cir. 2007) (quoting *Burger King*, 471 U.S. at 476) (internal

quotation marks omitted).  Thus, in *Air Products*, the Sixth Circuit found the out-of-

state defendants had purposefully availed themselves of acting in Michigan because

they entered contracts with the Michigan plaintiff that resulted in "a continuing

19

business relationship that lasted a period of many years." *Id*. Additionally, defendants contacted the Michigan-based plaintiff "on approximately several hundred occasions through telephone, email, facsimile, and ordinary mail correspondence." *Id*. Although, "'[a] numerical count of the calls and letters has no talismanic significance,'" the Sixth Circuit found these contacts constituted purposeful availment because many were initiated by the defendants and not the result of unilateral activity by the plaintiff. *Id*. (quoting *LAK, Inc. v. Deer Creek Enters.,* 885 F.2d 1293, 1301 (6th Cir.1989)) (alteration in original).

Here, the Court is persuaded Defendants have purposefully availed themselves of the privilege of acting, or causing a consequence, in Michigan. Like the defendant-citizen in *Power Investments*, Elrod affirmatively solicited money from Jilson, even after Jilson moved to Michigan. Additionally, he, both on behalf of himself and as agent for his companies, communicated extensively with Jilson from the time Jilson moved to Michigan until their relationship soured. As discussed in Section II.A *supra*, many of these communications concerned the outstanding loans, unpaid business expenses, or pending equity paperwork. Thus, the "alleged misrepresentations in these communications constitute the core of [the plaintiff's] [] claims" and are thus sufficient to constitute purposeful availment. *Power Invs.*, 927 F.3d at 919.

20

These allegedly misleading communications are in addition to the countless emails and phone calls from Elrod and other employees of SWORD, SWORD Manufacturing, and AOG that were necessary for the day-to-day operations of those businesses. *See Aug. v. Manley Toys, Ltd.*, 68 F. Supp. 3d 722, 731 (E.D. Mich. 2014) (defendant corporation purposefully availed itself of Michigan where defendant initiated contract with plaintiff residing in Michigan, sent over 10,000 emails and placed several hundred emails to plaintiff in Michigan, and sent numerous deposits to plaintiff's Michigan bank accounts). Furthermore, like the *Air Products* defendants, Defendants here entered contracts that created continuing obligations between them and Plaintiff while he resided in Michigan: the Third and Fourth Loans as well as the agreement that Plaintiff would receive a monthly fee for his work at AOG.

Accordingly, the Court holds Plaintiff has satisfied the "purposeful availment" prong.

### 2. Plaintiff's claims arise from Defendants contacts with the Forum, and it is reasonable to hold them to answer in Michigan.

The "arising from" prong of the due process test "is satisfied if 'a defendant's contacts with the forum state are related to the operative facts of the controversy.'" *Light Source, Inc. v. Display Dynamics, Inc.*, No. 09-14268, 2010 WL 2351489, at *6 (E.D. Mich. June 8, 2010) (quoting *CompuServe, Inc. v. Patterson,* 89 F.3d 1257,

21

1267 (6th Cir.1996)).  The Sixth Circuit has "articulated the standard for this prong in a number of different ways, such as whether the causes of action were made possible by or lie in the wake of the defendant's contacts, or whether the causes of action are related to or connected with the defendant's contacts with the forum state." *Air Products*, 503 F.3d at 553 (internal citations and quotation marks omitted). Additionally, in the Sixth Circuit, where "the first two criterion are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet this third criteria.'" *Id.* at 554 (quoting *Theunissen,* 935 F.2d at 1461).

Here, it is clear the cause of action arises from Defendants contacts.  Plaintiff claims Defendants breached contracts regarding the repayment of their loans, fraudulently induced Jilson to enter contracts and provide his time and services to Defendant entities, unjustly benefitted from the time and services he provided, violated Michigan securities law, and breached fiduciary duties owed to Jilson.  Pl. Resp. to Def. Mot. to Dismiss, ECF No. 9, PageID.171-72.  Thus, "[t]he cause of action arises directly from [Defendants] communications into [Michigan]." *Power Invs., LLC*, 927 F.3d at 919.  Because this is not an "unusual case," *Air Products*, 503 F.3d at 554 (quoting *Theunissen*, 935 F.2d at 1461), "it is reasonable to hold [Defendants] to account in the State where [their] fraud occurred and from which [they] benefitted financially," *Power Invs.*, 927 F.3d at 919.

22

Accordingly, the Court holds Plaintiff has also satisfied the "arising from" and "reasonableness" prongs.  As Plaintiff has satisfied the requirements of due process, the Court concludes it can exercise limited personal jurisdiction over Defendants.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that the Court **DENIES** Defendants' Motion to Dismiss (ECF No. 8).

**IT IS SO ORDERED**.

/s/ Gershwin Drain_____
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  May 10, 2022

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 10, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

23