UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH JILSON,

Plaintiff,

v.

JEREMY ELROD, et al.,

Defendants.

_____/

Case No. 21-cv-11878

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS THREE, FOUR, FIVE, SIX, AND SEVEN UNDER RULE 12(b)(6) (ECF No. 21) AND DENYING DEFENDANTS' MOTION TO DISMISS COUNTS THREE, FOUR, FIVE, SIX, AND SEVEN UNDER RULE 12(c) (ECF No. 19) AS MOOT

### I.   INTRODUCTION

On August 13, 2021, Plaintiff Kenneth Jilson initiated this action against Jeremy Elrod, SWORD International, Inc. ("SWORD"), SWORD Manufacturing, and Assured Outcomes Group, Inc. ("AOG") (collectively "Defendants"). ECF No. 1. Jilson filed an Amended Complaint on June 3, 2022. ECF No. 20. He brings claims for breach of contract (Count One), unjust enrichment (Count Two), promissory estoppel (Count Three), fraudulent inducement (Count Four), breach of

1

fiduciary duty (Count Five), minority oppression (Count Six), and, in the alternative to Counts Five and Six, securities fraud pursuant to MCL § 451.2101, *et seq.* (Count Seven). *Id.* He also requests declaratory judgment (Count Eight). *Id.*

Presently before the Court is Defendants' Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(b)(6).[1] ECF No. 21. The matter is fully briefed. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of this matter. Therefore, the Court will resolve the instant motion on the briefs. *See* E.D. Mich. LR 7.1(f)(2). For the following reasons the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(b)(6) (ECF No. 21). The Court will also **DENY** Defendants' Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(c) (ECF No. 19) **AS MOOT**.

## II.   BACKGROUND

### A. Factual Background

The "Facts Common to All Counts" in Plaintiff's Complaint (ECF No. 1) and Amended Complaint (ECF No.20) are the same, so the Court incorporates its

---

[1] All references to "Rules" are to the Federal Rules of Civil Procedure.

2

recitation of the facts from its Opinion and Order Denying Defendants' Motion to Dismiss Under Rule 12(b)(1) (ECF No. 14).

Defendant Elrod is a Nevada resident. Compl., ECF No. 1, PageID.2. He has three companies, all registered and with their principal places of business in Nevada. *Id*. Defendant SWORD International, is a manufacturer and developer of products used by the United States military, law enforcement, and hunters. *Id*. Defendant SWORD Manufacturing is the manufacturing arm of SWORD. Defendant AOG is an asset recovery company formed to support SpaceX. *Id*.

Jilson and Elrod met in or about 2014 and developed a friendship while Jilson was living in California. Elrod Decl., ECF No. 8-2, PageID.137; Compl., ECF No. 1, PageID.3. As part of their friendship, Jilson routinely provided business advice to Elrod. *Id*. Jilson also provided Elrod with a "seed working capital loan" in 2015, after SWORD received a military contract. *Id.* at PageID.4. Elrod repaid this loan in full, with interest, in 2016, *id.*, and it is not [at issue in] this lawsuit.

During the Fall of 2017, Jilson and Elrod discussed Jilson becoming more involved in SWORD and Elrod's other businesses. *Id*. Thus, on September 13, 2017, Elrod and Jilson executed a promissory note (the "First Note") on a $58,000 loan [that] Jilson provided Elrod, as the obligor, for a two-year term at a 15% interest rate (the "First Loan). *Id.* (citing First Note, ECF No. 1-2). Jilson provided the funds on September 26, 2017. *Id*. Although Elrod signed as the obligor, the funds from the First Loan were to be used by SWORD. Jilson Decl., ECF No. 9-2, PageID.180.

Despite providing the First Loan, Jilson was concerned about SWORD's viability. Compl., ECF No. 1, PageID.4. To allay his

3

concerns, Elrod offered to bring Jilson onboard to help grow and develop SWORD and Elrod's other companies. *Id.* Jilson agreed and left his then employer in January 2018. *Id.* In consideration for the unpaid work Jilson would be doing, Elrod promised Jilson equity in SWORD. *Id.* at PageID.5 ("Per our previous conversations I wanted to send you this email to confirm my intent to issue you equity shares in SWORD International. I believe that you could be a critical part of our team and while I know we have a number of items to tie down I listed below some of the objectives and support I would like to request for 2018.") (quoting Equity Conf., ECF No. 1-3). Jilson began performing in accordance with their agreement, and Elrod promised he would prepare the necessary paperwork to document Jilson's equity in SWORD. *Id.*

Given his promised ownership interest in SWORD, Jilson provided Elrod, as obligor, a second bridge loan of $30,000, with a one-year term at a 10% interest rate, on April 23, 2018 (the "Second Loan"). *Id.* at PageID.5-6. Around this time, Jilson also pushed Elrod to provide the documents memorializing Jilson's equity interest in SWORD. *Id.* at PageID.6 ("This email is to confirm my intention to bring you on as an equity partner at SWORD International. . . . I am open to the 30% stake we discussed and want only to flesh out details to ensure we are tracking on everything.") (quoting Second Equity Conf., ECF No. 1-4). As with the First Loan, despite Elrod signing as the obligor, the funds for the Second Loan were also to be used by SWORD and SWORD Manufacturing. Jilson Decl., ECF No. 9-2, PageID.180.

Throughout the following months, Jilson worked with Elrod on all of SWORD, SWORD Manufacturing, and AOG's day-to-day business operations. Compl., ECF No. 1, PageID.6. This included "overseeing the company finances, setting product prices, managing the inventory, improving general operating strategies, creating project budgets, reviewing contracts, [and] initiating strategic partnerships among other

4

tasks." Jilson Decl., ECF No. 9-2, PageID.180-81.  In addition to the operational work he was doing for the SWORD entities, Plaintiff's work for AOG included setting up employee payroll, managing 1099's, and invoicing SpaceX for all costs.  *Id.* at PageID.181.

Notably, in July 2018, Plaintiff moved from California to Michigan. *Id.* at PageID.179.  Nevertheless, he still communicated daily with Elrod and other employees of SWORD, SWORD Manufacturing, and AOG to conduct the business of the entities.  *Id.* at PageID.181.  In doing so, Jilson "received thousands of emails, phone calls, and text messages to [his] Michigan based devices."  *Id.*

In September 2018, Jilson and Elrod agreed Jilson would be compensated $5,000 per month for his work with AOG.  Compl., ECF No. 1, PageID.7; Jilson Decl., ECF No. 9-2, PageID.181.  Jilson sent invoices for September, October, and November of 2018, but Elrod only paid the fee for September.  *Id.* at PageID.182.  At that time, Elrod was using AOG's profits to support SWORD, comingling funds between the two entities.  Compl., ECF No. 1, PageID.7.  Given the financial situation, Elrod and Jilson agreed to stop paying themselves from AOG's profits and instead use all the capital to support SWORD. *Id.*  Nevertheless, Jilson did not waive the $10,000 that remained outstanding from his AOG invoices.  *See* Jilson Decl., ECF No. 9-2, PageID.182.

On November 25, 2018, Jilson provided a third bridge loan of $75,000, with a two-year term at a 10% interest rate, to SWORD as obligor (the "Third Loan").  Compl., ECF No. 1, PageID.7.  Jilson and Elrod verbally agreed to the terms of the loan.  *Id.*  Jilson prepared a promissory note memorializing the terms of the agreement, which he then sent to Elrod, but Elrod never returned the executed note.  *Id.*; *see also* Unexecuted Third Note, ECF No. 1-6.  Nonetheless, Jilson initiated the wire transfer of the funds from Michigan.  Jilson Decl.,

5

ECF No. 9-2, PageID.182; *see also* Compl., ECF No. 1, PageID.7 ("When you get a moment can you prepare an outbound wire from my saving account for $75,000?") (quoting Wire Transfer Req., ECF No. 1-5, PageID.47).

Jilson asked about the status of repayment for the First Loan on January 15, 2019. *Id.* at PageID.8. The First Loan was supposed to enter repayment in September 2018 and was fully due in September 2020. First Note, ECF No. 1-2, PageID.39. While Elrod acknowledged that he still needed to repay the First Loan, he took little to no action for several months. Compl., ECF No. 1, PageID.9. Then, in June 2019, Elrod assured Jilson that SWORD would soon be in position to repay the outstanding loans. *Id.* ([discussing] a $250,000 loan to complete several projects "total[ing] almost a million dollars in sales" in return for finishing the paperwork documenting Jilson's equity in SWORD, giving Jilson "complete financial controls and approval," beginning to pay back Jilson's personal loans "ASAP," continuing to reroute AOG funds as available, and prioritizing repaying the note "over anything else") (quoting June 19, 2019 Email, ECF No. 1-7, PageID.53).

Thus, on June 27, 2019, Jilson agreed to provide another bridge loan of $50,000, with a one-month term at a 1.5% interest rate, to SWORD as obligor (the "Fourth Loan"). *Id.* at PageID.9 (quoting Fourth Loan Conf., ECF No. 1-8, PageID.55). In his email discussing terms of the loan, Jilson also requested Elrod agree to complete the equity paperwork by August 1, 2019. *Id.* Elrod acknowledged the terms listed in the email were as they had discussed and "acceptable;" he thus asked that his email response serve as his agreement. *Id.* The next day, Elrod emailed Jilson saying that he had attached the signed promissory note, but the email did not contain any attachments. *Id.* (quoting June 28, 2019 Email, ECF No. 1-9, PageID.57) (citing Unexecuted Fourth Note, ECF No. 1-10). Again, Jilson nonetheless initiated the wire transfer of the loan from Michigan. Jilson Decl., ECF No. 9-2, PageID.183.

6

In late August 2019, Jilson followed up with Elrod regarding repayment of the Fourth Loan, which was due earlier that month, as well as other expenses he had fronted for SWORD and AOG.  Compl., ECF No. 1, PageID.11 ("We still have 2 additional expenses reports that are <u>way</u> overdue.  I sent these to you in February and they still have not been resolved.  These need to get processed this week, this is a lot of business expenses for me to be personally carrying. . . . When are you going to be able to send me a payment for the $50K note?") (quoting Aug. 25, 2019 Email, ECF No. 1-11, PageID.63) (emphasis in original).

Jilson followed up again in May 2020 and asked for a plan to resolve the outstanding debt.  *Id.* at PageID.11-12 ("What is the plan to get these loans paid? the 30K note is now 1 year overdue and is technically in default.  With the other notes, the company owe's [*sic*] me $257,611 plus what I am owed in expenses.  I have asked you several times for a payment plan.  You have told me that you would send me a plan[,] but it has never happened. . . .") (quoting May 6, 2020 Emails, ECF No. 1-12, PageID.65).  Elrod replied later that day that he would "wire $50K before the end of the week" and "attempt to clean up the remainder before the end of the year."  *Id.* at PageID.12.  On May 12, 2020, Jilson received a $50,000 wire from AOG.  *Id.* (citing AOG Wire Transf., ECF No. 1-13, PageID.67).  The amount resolved $13,951.72 in business expenses, and the remainder was put towards the balance of the Second Loan.

Around this time, Jilson introduced Elrod to Linear AMS, a Michigan company.  Jilson Decl., ECF No. 9-2, PageID.183.  SWORD, SWORD Manufacturing, and AOG have worked with Linear AMS to obtain prototypes of products.  *Id.* at PageID.184.  Also around this time, Jilson began doing product development work for SWORD.  *Id*.  He billed this work through Inside Track, LLC, a company he owns with his wife, and the invoices listed Jilson's Michigan address.  *Id*.

7

On August 26, 2020, Jilson followed up again about a payment plan for the outstanding loans and expenses. Compl., ECF No. 1, PageID.12-13 (quoting Aug. 26, 2020 Texts, ECF No. 1-14, PageID.69). Elrod responded but did not take any action until December 2020 when he asked for documentation for the outgoing and incoming payments. *Id.* at PageID.13 (quoting ECF No. 1-15, PageID.71).

Jilson followed up yet again in January 2021, and Elrod again assured Jilson that he would soon be able to pay him back. *Id.* However, Elrod did not pay him, so Jilson reached out again on February 1 and 13, 2021. *Id.* at PageID.13; *id.* at PageID.14 ("I haven't heard from you since our txt [sic] exchange last week. I've asked multiple times for a plan[;] however[,] you haven' followed up with me. I'm more than a little concerned at this point.") (quoting Feb. 13, 2021 Email, ECF No. 1-16, PageID.73). Elrod eventually responded that he was writing at Jilson's request "to reconfirm what [they had] discussed on the phone and via text previously" and that he "underst[oo]d that the note [was] past due based on the original paperwork," but Jilson "had given permission to extend based off of company needs." *Id.* (quoting Feb. 18, 2021 Email, ECF No. 1-17, PageID.75). Nevertheless, Elrod was "committed to repay the note and to do[ing] so at the earliest opportunity" but he "simply d[id] not have the liquidity" to do so "this quickly." *Id.* (quoting Feb. 18, 2021 Email, ECF No. 1-17, PageID.75). Thus, Elrod "guarantee[d] . . . to repay the note upon delivery and payment of [their] Airforce tandem barrel contract" in mid-April. *Id.* (quoting Feb. 18, 2021 Email, ECF No. 1-17, PageID.75).

When Jilson proposed a payment plan that included a payment each at the ends of February and March with the remaining balance due at the end of April, *id.* at PageID.15 (quoting Feb. 21, 2021 Email, ECF

8

No. 1-18, PageID.77), Elrod responded that he could not commit to that schedule, but he would "do everything possible to start making payments and hopefully secure a line of credit as previously discussed," *id.* (quoting Feb. 26, 2021 Email, ECF No. 1-19, PageID.79).

In March 2021, Jilson asked Elrod to propose a payment plan by April 1 because Elrod had rejected his without proposing an alternative. *Id.* (quoting ECF No. 1-20, PageID.81). Jilson also warned that Elrod's uncertainty about the financial health of the business "ha[d him] more than a little concerned" and Jilson would proceed to legal action if Elrod was unable to service the debt. *Id.* (quoting ECF No. 1-20, PageID.81). In response to this email, Elrod called Jilson to tell him the bank would extend a $250,000 line of business credit for SWORD and Elrod was expecting significant customer invoice payments that would allow him to resolve the debt. *Id.* at PageID.15-16. He also reiterated this via text message. *Id.* at PageID.16 (citing Apr. 5, 2021 Text, ECF No. 1-22, PageID.85). Nevertheless, Elrod did not repay Jilson after receiving the line of credit or when the Airforce contract entered repayment. *Id.* at PageID.17 (quoting, Apr. 26, 2021 Text, ECF No. 1-23, PageID.87).

Throughout the month of May 2021, Elrod sent Jilson several reassurances via text message that he was working on the payments. *Id.* at PageID.17-18 (quoting May 5, 2021 Texts, ECF No. 1-24, PageID.89; May 11, 2021 Texts, ECF No. 1-25, PageID.91; May 24, 2021, ECF No. 1-26, PageID.93). Then, on May 28, 2021, Elrod sent Jilson a text message saying he had sent an email, presumably confirming the full payment had been sent, but Jilson did not receive the email or any of the checks or deposits Elrod had told him to expect. *Id.* at PageID.18 (quoting May 28, 2021 Text, ECF No. 1-27, PageID.95).

ECF No. 14, PageID.369–79 (footnotes omitted).  Jilson claims he has not been able to contact Elrod since.  ECF No. 20, PageID.465.

### B. Procedural Background

As stated *supra*, Jilson initiated this action on August 13, 2021.  ECF No. 1. Defendants moved to dismiss the complaint for lack of personal jurisdiction.  ECF No. 8.  The Court held a hearing on the matter and denied the motion as to all Defendants on May 10, 2022.  ECF No. 14.  Shortly thereafter, Defendants moved to dismiss Counts Three, Four, Five, Six, and Seven under Rule 12(b)(6), ECF No. 16.  The Court struck the motion as procedurally improper under Rule 12(g)(2).  ECF No. 18.  Defendants then moved to dismiss Counts Three, Four, Five, Six, and Seven under Rule 12(c) on May 18, 2022.  ECF No. 19.  However, instead of responding to the motion, Jilson voluntarily amended his complaint.  *See* ECF No. 20. Defendants then filed the instant Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(b)(6).  ECF No. 21.

### III.   LAW & ANALYSIS

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a district court to assess whether the plaintiff has stated a claim upon which relief may be granted.  To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must comply

10

with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2).  *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  Rule 8(a)(2) requires "a short and

plain statement of the claim showing that the pleader is entitled to relief, in order to

give the defendant fair notice of what the . . . claim is and the grounds upon which

it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ.

P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (internal quotation marks

omitted).  To meet this standard, a complaint must contain sufficient factual matter,

accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*,

550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678–80 (applying the plausibility

standard articulated in *Twombly*).

When considering a Rule 12(b)(6) motion to dismiss, the Court must construe

the complaint in the light most favorable to the plaintiff and accept all his factual

allegations as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).  While

courts are required to accept the factual allegations in a complaint as true, the

presumption of truth does not apply to a claimant's legal conclusions. *See Iqbal,*

556 U.S. at 678.  Therefore, to survive a motion to dismiss, the plaintiff's pleading

for relief must provide "more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters*

11

*v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir. 2007) (citations and quotation marks omitted) (quoting *Twombly,* 550 U.S. at 555).

The district court generally reviews only the allegations set forth in the complaint in determining whether to grant a Rule 12(b)(6) motion to dismiss; however, "matters of public record, orders, items appearing in the record of the case, and *exhibits attached to the complaint*, also may be taken into account." *Amini v. Oberlin College*, 259 F. 3d 493, 502 (6th Cir. 2001) (emphasis in original). Documents attached to a defendant's "motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim." *Id.*; *see also Commercial Money Ctr, Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ("[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment.").[2]

---

[2] Here, the only attachment to Defendants' motion to dismiss is a redline comparison between Plaintiff's Complaint (ECF No. 1) and Amended Complaint (ECF No. 20). This is necessarily integral to the pleadings, so the Court can consider the attachment without converting Defendants' motion to one for summary judgment.

12

**B. Discussion**

    **1. Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(b)(6)**

        **i.  Choice of Law**

Defendants argue that the Court should apply Nevada law in addressing its motion because the Defendants are all Nevada residents and the relevant factual allegations occurred before Plaintiff moved to Michigan.[3]  *See* ECF No. 21, PageID.545.  Jilson concedes Nevada law applies to his breach of fiduciary duty (Count Five) and minority oppression (Count Six) claims.  ECF No. 25, PageID.647.  However, he argues that under Michigan's choice of law rules, Michigan law applies to his promissory estoppel (Count Three), fraudulent inducement (Count Four), and state securities fraud (Count Eight) claims.  *Id.* at PageID.646.

A federal court exercising diversity jurisdiction "appl[ies] the choice-of-law rules and substantive law of the forum state."  *Smith v. Gen. Motors LLC*, 988 F.3d 873, 879 (6th Cir. 2021) (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008)).  In tort actions, Michigan courts "apply Michigan law 'unless a rational reason to do otherwise exists.'"  *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d

---

[3] Defendants also state that California law should apply because the loan documents state they are governed by California law, but they do not actually apply California law in their motion.  The Court presumes Defendants were referring to Counts I and II, which Defendants do not seek to dismiss.

13

690, 692 (6th Cir. 2013) (quotation marks omitted) (quoting *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286, 562 N.W.2d 466, 471 (1997)). There is a two-step process for determining whether such a rational reason exists:

> First, we must determine if any foreign state has an interest in having its law applied.  If no state has such an interest, the presumption that Michigan law will apply cannot be overcome.  If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

*Id.* (quoting *Sutherland*, 562 N.W.2d at 471).  "Michigan courts will 'use another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter.'"  *Williams v. Toys "R" Us*, 138 F. App'x 798, 803 (6th Cir. 2005) (*Hall v. Gen. Motors Corp.*, 229 Mich. App. 580, 585, 582 N.W.2d 866, 868 (1998)).

However, courts need not resolve conflict of law issues when Michigan law is consistent with the law of other forums and the asserted conflict is "false." *CenTra*, 538 F.3d at 409 (citing *Williams*, 138 F. App'x at 803).

> A 'false conflict' exists where the laws of the interested jurisdictions are: (1) the same; (2) different but would produce the same outcome under the facts of the case; or, (3) when the policies of one jurisdiction would be furthered by the application of its laws while the policies of the other jurisdiction would not be advanced by the application of its laws.  By contrast, a 'true conflict' exists where two or more states have

14

a legitimate interest in a particular set of facts in litigation and the laws
of those states differ or would produce a different result.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL
1207833, at *6 (E.D. Mich. Apr. 13, 2022) (internal citation omitted) (quoting
*Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1354, 1357 (S.D. Fla. 2019)).

For the reasons discussed *infra*, the Court will apply Michigan law to Jilson's
promissory estoppel (Count Three), fraudulent inducement (Count Four), and
securities fraud (Count Seven) claims.

### ii.   Promissory Estoppel (Count Three)

First, Defendants contend that Jilson has failed to state a claim for promissory
estoppel because there is no specific performance that can be enforced, there is no
basis for specific performance, and there is no claim against AOG.  ECF No. 21,
PageID.542.  The Court disagrees in part.

As a preliminary matter, Jilson asserts that Michigan's law regarding claims
for promissory estoppel is consistent with Nevada's, so there is a false conflict, and
Michigan law should apply. ECF No. 25, PageID.646.  The Court agrees.  *Compare*
*Bodnar v. St. John Providence, Inc.*, 327 Mich. App. 203, 226–27, 933 N.W.2d 363,
377 (2019) ("To successfully assert a claim for promissory estoppel, a plaintiff must
establish the following elements: (1) a promise, (2) that the promisor should
reasonably have expected to induce action of a definite and substantial character on

15

the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." (quotation marks omitted)) *with Pink v. Busch*, 100 Nev. 684, 689, 691 P.2d 456, 458 (1984) ("To establish promissory estoppel four elements must exist: (1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped." (quotation marks omitted)).

Relying on *Torres v. Nev. Direct Ins. Co.*, 131 Nev. 531, 540, 353 P.3d 1203, 1209 (2015), Defendants contend that Elrod's emails did not constitute a promise or conduct intended to be acted upon sufficient to support a promissory estoppel claim under Nevada law.  ECF No. 21, PageID.547–48.  Specifically, Defendants assert that the emails were not sufficiently clear and definite or that they were ambiguous as to essential terms.  *Id.* at PageID.546.  Although Defendants do not explicitly argue that this requirement creates a conflict of laws between Nevada and Michigan promissory estoppel claims, the Court notes that it does not.  Michigan law also requires the "promise be clear and definite."  *State Bank of Standish v. Curry*, 442 Mich. 76, 85, 500 N.W.2d 104, 108 (1993).  Accordingly, although the elements of

16

the claims differ between the jurisdictions, claims for promissory estoppel under Michigan and Nevada law "would produce the same outcome under the facts of the case." *In re Monostable Elec. Gearshift Litig.*, 2022 WL 1207833, at *6. Thus, the Court will apply Michigan law to Count Three.[4]

The Court concludes that Jilson has stated a claim for promissory estoppel under Michigan law. As to the first element of the claim, Elrod's emails to Jilson constitute a promise to issue Jilson equity shares in SWORD in return for labor and/or loans.[5] Elrod's January 2, 2018 email "confirm[ed] his intent to issue [Jilson] equity shares in SWORD International" and listed several "objectives and support" Elrod "request[ed]" in exchange. ECF No. 20-3, PageID.488. The April 28, 2018

---

[4] The Court notes that it would apply Michigan law even if there were a conflict of laws. Michigan's interest in having its law applied seems to be just as strong as, if not stronger than, Nevada's. Two of the four times Elrod directly or indirectly promised Jilson equity in SWORD (January 2, 2018, April 28, 2018, June 19, 2019, and June 27, 2019) occurred after Jilson moved to Michigan in July 2018. The other two occurred while Jilson lived in California, so more of the alleged injury occurred in Michigan than in Nevada. Nevada's main interest in having its law applied stems from Defendants being Nevada residents, but "place of injury is well recognized under the law as a distinct — and distinctly more significant — relationship compared with mere happenstance of party domicile." *In re Monostable Elec. Gearshift Litig.*, 2022 WL 1207833, at *7 (collecting cases).

[5] Defendants also argue the claim fails because a promissory estoppel claim requires the parties to have entered a formal contract. ECF No. 21, PageID.547–48; ECF No. 27, PageID.677. This is inaccurate. "[P]romissory estoppel is an equitable theory used to make a promisor liable on a promise where there is no bargained for consideration to support a contract." *Brilliance Corp. v. Ludlum*, No. 186643, 1996 WL 33348804, at *2 (Mich. Ct. App. Nov. 8, 1996).

17

email likewise confirmed Elrod's intent to make Jilson an equity partner, discussed giving Jilson a 30% stake, and asked Jilson to "focus [his] efforts on refining [their] business operations and increasing [their] sales channels."   ECF No. 20-4, PageID.490.  Similarly, in the June 19, 2019 email, Elrod asked Jilson for a $250,000 loan in exchange for, *inter alia*, finishing the paperwork documenting Jilson's ownership in SWORD.   ECF No. 20, PageID.456; ECF No. 20-7, PageID.498. Finally, on June 27, 2019, Jilson emailed Elrod offering to extend SWORD a $50,000 loan and asking if they could "agree" to complete the paperwork for his 20% equity by August 1, 2019.  ECF No. 20-8, PageID.500.  Jilson explicitly stated that he would wire the money if this condition was "acceptable."   *Id*.   Elrod responded later that day saying that his email would "serve as a verbal agreement." *Id*.

Contrary to Defendants' arguments, these emails are sufficiently "clear and definite" and "unambiguous as to essential terms" to sustain a promissory estoppel claim.  *Cf. Malburg v. Wayne J. Lennard & Sons, Inc.*, No. 236980, 2003 WL 22026404, at *3 (Mich. Ct. App. Aug. 28, 2003) (holding that actions of, and communications between, parties were insufficient to support a promissory estoppel claim where defendant did not say what "would have happened if plaintiffs provided the money").  "A promise is a manifestation of intention to act or refrain from acting

18

in a specified manner, made in a way that would justify a promisee in understanding that a commitment had been made." *Schmidt v. Bretzlaff*, 208 Mich. App. 376, 379, 528 N.W.2d 760, 762 (1995).  However, promissory estoppel claims do not require agreement on every term to be enforceable.  *Curry*, 442 Mich. at 89, 500 N.W.2d at 110 ("This approach is consistent with the general rule of contract that, where the parties have left open some matters to be determined in the future, enforcement is not precluded if there exists a method of determining the terms of the contract either by examining the agreement itself or by other usage or custom that is independent of a party's mere 'wish, will and desire.'").

With respect to the second element of a promissory estoppel claim, Elrod should have reasonably expected to induce Jilson to action with his promises because he explicitly asked for Jilson to act in exchange for the equity shares.  Regarding the third element, Jilson has plausibly alleged he continued to work for Defendants without compensation for two years and loan Defendants money in reliance on Elrod's promises.   Even Defendants acknowledge that "Jilson's continued performance seems to be based on his hope that Elrod would eventually finish the paperwork."  ECF No. 21, PageID.548.  As such, the Court finds Jilson has plausibly pleaded all the elements of the claim.

19

Next, Defendants argue "there is no legal basis for Jilson's claim for specific performance" because he did not request specific performance at the time and "his remedy, if any, lies in damages." ECF No. 21, PageID.549. First, the Court can find no support for Defendants' assertion that a plaintiff must demand specific performance at the time of injury to later obtain equitable relief, and Defendants do not provide any justification for their contention. Second, because promissory estoppel is "an equitable doctrine[,] the remedy is flexible, and will vary as justice requires." *Woodland Harvesting, Inc. v. Georgia Pac. Corp.*, No. 09-10736, 2011 WL 4596041, at *1 (E.D. Mich. Oct. 4, 2011). Thus, the Court may grant specific performance or award damages if Jilson is ultimately successful on his claim. *Id.* at *1–2. Jilson seeks either specific performance or damages for Count Three. ECF No. 20, PageID.472. He has thus requested relief that is appropriate for the claim, and the Count will not be dismissed on that basis.

Next, Defendants contend the only claims against AOG are conclusory and thus cannot support a claim for promissory estoppel. ECF No. 21, PageID.549. To the extent Jilson asserts he is entitled to an ownership interest in AOG under a promissory estoppel theory, that claim will be dismissed. The only factual allegation in the Amended Complaint regarding promised equity shares in AOG is that Elrod's "top priority" in his June 19, 2019 email "was to 'finish paperwork' documenting

20

Jilson's ownership in SWORD and AOG since that had been obviously agreed to and earned, but not been completed."  ECF No. 20, PageID.456.  Even viewed in the light most favorable to the plaintiff, *Lambert*, 517 F.3d at 439, neither this statement nor the email it cites are sufficiently clear and definite to support a promissory estoppel claim for an interest in AOG.

To the extent Jilson seeks to hold AOG jointly and severally liable for his alleged equity interest in SWORD, he has plausibly pleaded a basis for doing so. Jilson alleges that "SWORD, SWORD Manufacturing, and AOG are mere instrumentalities of Elrod," and that "at all times relevant to the complaint, AOG operated as an alter ego of SWORD."  ECF No. 20, PageID.465–66.  He further alleges that "AOG, SWORD Manufacturing, and SWORD routinely disregarded corporate formalities by transferring significant funds between the entities. Commingling funds, and/or paying each other's expenses."  *Id*.

Finally, to the extent Jilson seeks repayment of the loans, all of which were governed by formal promissory notes, on a promissory estoppel theory, the Court agrees with Defendants that this is an improper method for seeking relief.  *See U.S. Specialty Ins. Co.*, 2017 WL 1549764, at *2 ("Under well-settled Michigan law, a plaintiff cannot assert quasi-contractual theories if an enforceable express contract exists." (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181

21

(6th Cir. 1996); *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 506 (6th Cir. 1995)).

Accordingly, the Court will dismiss Count Three only to the extent Jilson asserts that he is entitled to an equity interest in AOG or repayment of the loans based on a promissory estoppel theory. Otherwise, Jilson has plausibly pleaded his promissory estoppel claim.

### iii.    Fraudulent Inducement (Count Four)

Next, Defendants argue Jilson fails to state a claim for fraudulent inducement because he only pleads a failed contract negotiation and does not seek recission. ECF No. 21, PageID.542. The Court disagrees in part.

As with Count Three, Jilson contends that Michigan and Nevada claims for fraudulent inducement are consistent, so there is a false conflict of laws, and the Court should apply Michigan law. ECF No. 25, PageID.650. Under Michigan law, to establish fraudulent inducement a plaintiff must show that

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that is was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

22

*Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 276 Mich. App. 146, 161, 742 N.W.2d 409, 420 (2007).  Similarly, under Nevada law, to establish fraudulent inducement, a plaintiff must show

> (1) a false representation made by [the defendant], (2) [the defendant's] knowledge or belief that the representation was false (or knowledge that [he or she] had an insufficient basis for making the representation), (3) [the defendant's] intention to therewith induce [the plaintiff] to consent to the contract's formation, (4) [the plaintiff's] justifiable reliance upon the misrepresentation, and (5) damage to [the plaintiff] resulting from such reliance.

*J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 290, 89 P.3d 1009, 1018 (2004).   Therefore, the Court agrees that a claim for fraudulent inducement "would produce the same outcome under the facts of the case" whether the Court applied Michigan or Nevada law.  *In re Monostable Elec. Gearshift Litig.*, 2022 WL 1207833, at *6.  Accordingly, the Court agrees that the conflict of laws is false and will apply Michigan law.[6]

Defendants argue Jilson's fraudulent inducement claim fails because if the parties had agreements that Jilson was to receive an equity interest in SWORD or AOG or that Defendants would repay the outstanding loans or business expenses, Jilson should sue for breach of contract.  ECF No. 21, PageID.550–51.  If they did

---

[6] As with Count Three *supra*, the Court notes that under Michigan's choice of law rules, the Court would apply Michigan law even if there were a true conflict of laws.

23

not have agreements covering those matters, Defendants contend, Jilson cannot bring a fraudulent inducement claim for an unfinished contract negotiation. *Id*. Defendants mischaracterize Count Four. Instead, Jilson claims that he was fraudulently induced to work for over two years without compensation, loan over $173,000 to the defendant entities, and incur at least $10,000 in unpaid invoices. ECF No. 20, PageID.473.

Regardless, Jilson does not respond to Defendant's assertion that he cannot pursue his fraudulent inducement claim because he and Defendants were not parties to a contract. *See generally* ECF No. 25, PageID.650–53. Nor was the Court able to find any authority to support sustaining a fraudulent inducement claim without an underlying contract. Jilson does not allege he had formal contracts covering his employment with Defendants or for repayment of the business expenses he incurred. *See generally* ECF No. 20. Accordingly, Jilson can only recover on Count Four, if at all, if he has plausibly alleged he was fraudulently induced into the loan agreements.

To the extent Defendants argue Jilson cannot simultaneously maintain a breach of contract claim and a fraudulent inducement claim based on the loan agreements, *see* ECF No. 21, PageID.550–51, they are incorrect. "A plaintiff may proceed on these alternative theories when the complaint alleges fraud extraneous to

24

the contract." *Michigan First Credit Union v. Al Long Ford, Inc.*, No. 291146, 2010 WL 5129890, at \*1 (Mich. Ct. App. Dec. 16, 2010) (citing *Huron Tool & Engineering Co. v. Precision Consulting Serv., Inc.*, 209 Mich. App. 365, 373, 532 N.W.2d 541, 545 (1995); *Gen Motors Corp. v. Alumi-Bunk, Inc.*, 482 Mich. 1080, 757 N.W.2d 859 (2008)).

The Court concludes that Jilson has plausibly pleaded that he was fraudulently induced into providing the Second, Third, and Fourth Loans.[7]  Jilson alleges Elrod falsely represented to him that he would receive 20% equity in SWORD and an equity interest in AOG and that Defendants would repay the outstanding loans and business expenses.  ECF No. 20, PageID.472–73.  Based on these false material representations, Jilson claims, in relevant part, that he continued to loan Defendants money.  *Id.* at PageID.473.  Contrary to Defendants' assertion, Jilson has plausibly alleged Elrod as the "promisor had no intention to perform at the time the promise was made."  ECF No. 21, PageID.551 (citation).  Jilson claims that Elrod strung him along for two years before he eventually stopped responding to Jilson's attempt to

---

[7] Jilson made the First Loan before Elrod made any allegedly false representations, and thus that loan cannot serve as the basis for a fraudulent inducement claim.  *See Samuel D. Begola Servs., Inc. v. Wild Bros.*, 210 Mich. App. 636, 639, 534 N.W.2d 217, 219 (1995) ("Fraud in the inducement occurs where a party materially misrepresents *future* conduct . . . ." (emphasis added)).

25

contact him.  *See generally* ECF No. 20, PageID.450–65.  Viewing the complaint in the light most favorable to the plaintiff, *Lambert*, 517 F.3d at 439, the Court infers that Elrod did not ever intend to issue the equity interests or repay the debts.

Finally, Defendants contend that Jilson seeks the wrong remedy because he requests damages instead of recission.  ECF No. 21, PageID.551.  This is incorrect. "Michigan law allows a defrauded party to a contract to reject rescission and to affirm the contract and seek the value which the contract would have had if the representations had been true."  *Nationwide Motorist Ass'n of Mich. v. Freeman*, 405 F.2d 699, 702 (6th Cir. 1969) (citing *Nowicki v. Podgorski*, 359 Mich. 18, 101 N.W.2d 371 (1906); *Gross v. Morosky*, 366 Mich. 114, 113 N.W.2d 863 (1962)); *see also Kraus v. Arthur Murray Studios of Mich., Inc.*, 2 Mich. App. 130, 132, 138 N.W.2d 512, 513 (1965) ("One of the remedies for fraud is a suit for damages caused by the fraud." (citing *Kordis v. Auto Owners Insurance Co.*, 311 Mich. 247, 18 N.W.2d 811(1945)).  Here, Jilson has already transferred Defendants the money for the loans, so the contracts at issue are no longer executory, despite Defendants' arguments otherwise.[8]

---

[8] The Court notes that Nevada law would also allow Jilson to pursue damages under these circumstances.  *J.A. Jones Const.*, 120 Nev. at 289, 89 P.3d at 1017 ("It is the law that one who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud." (citation omitted)).

26

Accordingly, the Court will dismiss Count Four only to the extent that Jilson claims he was fraudulently induced to work without compensation or incur unpaid business expenses.  The claim otherwise survives.

### iv.   Breach of Fiduciary Duty (Count Five) and Minority Oppression (Count Six)

Next, Defendants assert that Jilson fails to state claims for breach of fiduciary duty and minority oppression because Jilson is not an owner of SWORD, and the claims are factually deficient.  ECF No. 21, PageID.542.

Under Nevada law, to prevail on a breach of fiduciary duty claim, the plaintiff must establish: "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) the breach proximately caused the damages."  *Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009).  "Corporate officers and directors owe a [fiduciary] duty *to the corporation and to non-controlling shareholders . . . .*" Nev. Jury Instructions: Civil (2018) § 15.18 (emphasis added).  Similarly, "majority shareholder[s] owe[] a fiduciary duty *to the corporation and to non-controlling shareholders . . . .*"  *Id.* § 15.20 (emphasis added).  With respect to a minority oppression claim, although the Nevada Supreme Court has yet to address the issue, the Fifth Circuit predicted that the Nevada Supreme Court would impose a fiduciary duty running from majority shareholders to minority shareholders in a close

27

corporation similar to that applicable to partners in a partnership. *Hollis v. Hill*, 232 F.3d 460, 468 (5th Cir. 2000).

Jilson does not argue that he can sustain either claim without first showing that he is a shareholder of SWORD. Instead, in both Counts, Jilson alleges, "Pursuant to numerous agreements between the parties as evidenced by the communications laid out supra, Jilson owns a 20% equity interest in SWORD." ECF No. 20, PageID.474, PageID.475. However, this statement is directly contradicted by the remainder of the First Amended Complaint. Jilson repeatedly alleges that "Elrod promised [him] equity in SWORD" in "consideration for [Jilson's] unpaid work." *Id.* at PageID.451. Notably, according to the First Amended Complaint, Jilson and Elrod last discussed Jilson's equity interest in June 2019, at which time Jilson asked Elrod to agree to complete the paperwork conveying his ownership interest by August 1, 2019. ECF No. 20, PageID.457. However, Jilson makes no further allegation that Elrod did, in fact, complete the paperwork. *See generally* ECF No. 20. Indeed, Jilson's promissory estoppel claim (Count Three) is premised on the fact that "[d]espite Jilson's repeated requests and demands, Elrod has refused to transfer to Jilson the promised business interest."

Therefore, Jilson's breach of fiduciary duty and minority oppression claims fail because he has not plausibly pleaded an ownership interest in SWORD. As such,

he cannot show that Elrod owed him a fiduciary duty as an officer or "fellow" shareholder. Nor can he show that he is a minority shareholder. Accordingly, the Court will dismiss Counts Five and Six.

### v.   Michigan Securities Fraud (Count Seven)

Finally, Defendants contend Jilson fails to state a claim for violation of the Michigan's Uniform Securities Act, MCL § 451.2101, *et seq.*, because the transaction occurred before Jilson moved to Michigan, Jilson's allegations are factually deficient, and the claim is time-barred. ECF No. 21, PageID.542

As a preliminary matter, as discussed *supra*, two of the four times Elrod directly or indirectly offered Jilson equity in SWORD occurred after Jilson moved to Michigan in July 2018. Specifically, Elrod agreed to complete the equity paperwork on June 19, 2019, and June 27, 2019. Jilson also paid the Third and Fourth Loans in November 2018 and June 2019, respectively. Thus, the Court will apply Michigan law to Count Seven.

The Court also finds that the claim is not time-barred. Mich. Comp. Laws § 451.2509(10)(b) provides, in relevant part, that "[a] person may not obtain relief if an action is not commenced . . . within the earlier of 2 years after discovery of the facts constituting the violation or 5 years after the violation occurred." A claim generally accrues "at the time the wrong upon which the claim is based was done

29

regardless of the time when damage results." MCL 600.5827. In other words, it is "the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which the defendant breached his duty." *Moll v Abbott Laboratories*, 444 Mich. 1, 12; 506 N.W.2d 816, 822 (1993). Notably, in negligent misrepresentation cases, the Michigan Supreme Court has determined that the cause of action does not accrue before the plaintiff has, or should have, knowledge of the negligent misrepresentation. *Id.* 444 Mich. at 13, 506 N.W.2d at 823. Here, Jilson has plausibly alleged he was harmed in May 2021 when Elrod stopped responding to him, and it became clear that Elrod was not going to complete the equity paperwork. *See* ECF No. 20, PageID.465. Given that Jilson filed his first Complaint in August 2021, he was well within the two-year limitations period, and the Court will address the merits of Jilson's securities fraud claim.

Jilson alleges Elrod violated Michigan's Uniform Securities Act by offering him the sale of a security induced by materially false statements that Jilson would receive a 20% equity interest in SWORD. ECF No. 20, PageID.478. Michigan Compiled Laws § 451.2501 provides, in relevant part, that "[i]t is unlawful for a person, in connection with the offer sale, or purchase of a security . . . to directly or indirectly . . . [m]ake an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances

30

under which they were made, not misleading."  However, a "security" "includes a

contractual or quasi-contractual arrangement that meets all of the following: (A) A

person furnishes capital, other than services, to an issuer under the arrangement. . . .

(D) The person furnishing the capital under sub-paragraph (A) *does not intend to be*

*actively involved in the management of the enterprise in a meaningful way*."  MCL

451.2102c(c)(i) (emphasis added).  Additionally, "[t]he term includes an *investment*

in a common enterprise with the expectation of profits to be derived primarily from

the efforts of a person other than the investor."  MCL 451.2102(c)(v) (emphasis

added).

The Court concludes that Elrod cannot reasonably be said to have sold Jilson

a security within the meaning of the statute.  Black's Law Dictionary defines an

"investment" as "[a]n expenditure to acquire property or assets to produce revenue;

a capital outlay."  Investment, Black's Law Dictionary (11th ed. 2019).  In contrast,

a "loan" is "[a]n act of lending; a grant of something for temporary use" or "[a] thing

lent for the borrower's temporary use; esp., a sum of money lent at interest."  Loan,

Black's Law Dictionary (11th ed. 2019).

Here, Jilson offered the Third and Fourth Loans (as well as the First and

Second Loans) with the explicit expectation that he would be paid back the money

that he provided, plus interest.  Even viewing the complaint in the light most

31

favorable to the plaintiff, *Lambert*, 517 F.3d at 439, these payments cannot

reasonably classified as "investments" as required by MCL 451.2102(c)(v).  They

are clearly "loans;" Jilson even refers to them as such throughout the First Amended

Complaint.  *See generally* ECF No. 20.  Moreover, Jilson alleges he "worked with

Elrod on all of the day-to-day business operations of SWORD."  ECF No, 20,

PageID.453.  Indeed, Jilson alleges the equity interest was consideration for the

unpaid work he performed.  He is thus, and always intended to be, heavily involved

with SWORD in contravention of MCL 451.2102c(c)(i).  As such, Jilson has not

plausibly alleged Elrod sold him a security within the meaning of Michigan's

Uniform Securities Act and has failed to state a claim for a violation of MCL

451.2501.  Accordingly, the Court will dismiss Count Seven.

### 2. Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(c) (ECF No. 19)

As indicated *supra*, Defendants earlier filed a Motion to Dismiss Counts

Three, Four, Five, Six, and Seven under Rule 12(c) (ECF No. 19) on May 18, 2022.

Instead of responding to the motion, Jilson filed his First Amended Complaint (ECF

No. 20).  "Generally, an amended complaint supersedes the original complaint, thus

making the motion to dismiss the original complaint moot."  *Klein by Klein v.*

*Caterpillar Inc.*, 581 F. Supp. 3d 912, 919 (E.D. Mich. 2022) (citation omitted);

*Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (holding

32

that an amended complaint supersedes all previous complaints and becomes the operative pleading). Accordingly, Defendants' Motion to Dismiss Counts Three, Four, Five, Six, and Seven under Rule 12(c) (ECF No. 19) is **DENIED AS MOOT**.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(b)(6) (ECF No. 21) is **GRANTED IN PART AND DENIED IN PART**. Specifically, the Motion is **GRANTED** as to Count Three to the extent Plaintiff asserts that he is entitled to equity in AOG or repayment of the loans based on the doctrine of promissory estoppel, as to Count Four to the extent Plaintiff asserts he was fraudulently induced to work without compensation or incur unpaid business expenses, and as to the entirety of Counts Five, Six and Seven. The Motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Counts Three, Four, Five, Six, and Seven Under Rule 12(c) (ECF No. 19) is **DENIED AS MOOT**.

33

**IT IS SO ORDERED**.




/s/ Gershwin Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  December 14, 2022


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
December 14, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

34